Final case on our call this morning is Agenda No. 16, Case No. 106805, City of Chicago v. Prologis, Appalachia. Mr. Powell, I presume? Pardon me? Mr. Powell? This is, my name is Michael Ryan. May it please the Court, my name is Michael. I represent the defendant appellant as well as the intervener's appellant. And with me today is Mr. William Quinlan, Mr. James Carroll, Mr. Sean Staples from Mott Shellis, as well as Mr. William Ryan and Ms. Lauren Ryan from Ryan and Ryan, all of which represent those appellants. I'm going to start with a 20-minute opening argument. After the City has had a chance to have their argument, Mr. Ryan from my firm is going to be doing the 10-minute rebuttal. As this Court is aware, this is a case of first impression. The issue before the Court is whether TIF bonds issued by the Village of Bensonville are property interests requiring payment of just compensation when the underlying fee simple title to all the real estate from which the bonds are paid is condemned through the power of eminent domain by the City of Chicago in year 10 of the 20-year bond term. This is a case of first impression for the Court because municipalities do not condemn their own redevelopment projects within their own TIF districts. And it's a rare situation for a municipality to extraterritorially condemn property in another municipality, let alone that municipality's entire TIF district, which is what Chicago has done here. There are three points I will make today that prove why the bondholders are entitled to just compensation. The first is that the property interest held by the bondholders is a protected property right and not a mere unilateral expectation. Second, the TIF bonds operate to encumber the redevelopment project area through the year 2015, and thus this is not a case involving consequential loss under OMNO, but it is a direct loss of property right requiring payment of just compensation. And third, the denial of just compensation to the bondholders is inequitable and will undermine the future use of tax increment financing in Illinois. To begin with my first point, that the bonds are protected property. The bondholders' interest is not only the TIF bonds, but it's also the covenants that make up the redevelopment agreement and the bond ordinance, which not only created the TIF bonds, but together with the TIF bonds formed one contract with the Village of Bensonville. And if we analyze those covenants in the contract, it makes clear that the bondholders have a protected property interest. First, the contract provides that in exchange for the agreement to build an air cargo and warehouse distribution center, Bensonville will issue TIF bonds which pay 100% of the tax increment generated from the entire redevelopment project to the bondholders through the year 2015. As this court is aware, tax increment is the increase in the real estate taxes created by the new development over the frozen taxes when the redevelopment plan is approved. The contract also required Bensonville to collect the tax increment and pay it to the bondholders. Additionally, Bensonville warranted to take all action necessary to ensure that the development would occur, and Bensonville also warranted it would take no action or omit to take any action that would adversely affect the TIF bonds. Finally, this contract is not revocable by Bensonville, and therefore the combination of all these covenants constitutes a protected property interest because it gives the bondholders an absolute entitlement to 100% of the tax increment until the year 2015, whatever that tax increment may be from year to year. So, Ryan, why isn't your argument defeated? I mean, I know you cite AHO, I think it's pronounced that way in Fleurie, right, the federal cases? We cite AHO in Fleurie, correct. For the proposition. But the bonds in this case, and I believe you say there was a property interest, but you would agree they're not secured by the land itself, right? I agree that they don't have a security interest in the land in this sense. Well, let me, I'll ask the second part of the question, then you can pick up. They were secured only by the incremental taxes collected from the property, if any, right? The bonds do claim that our interest is only in the incremental taxes, and that's what the security provision states in the agreements. And it's quite different, anyway, than AHO in Fleurie. Well, I don't think it's any different, because in AHO in Fleurie, the issue in that case was whether the elimination of the right to collect future assessments for the construction and future maintenance of a drainage district required payment of just compensation above the amount of the fee simple title that was paid, above the amount of the compensation paid to the fee owner. And the statute in both cases did not impose a lien in those cases either. But the court nevertheless found that an encumbrance existed, because the courts found that it was the state legislature's intent to impose an encumbrance on the real estate. Is there any significance to the fact that the federal case has dealt with specialist assessment districts, in which, pursuant to the authorizing legislation, the right to collect assessments was secured and made appurtenant to the fee of the land, and therefore passed with the land to the condemning authority? Well, I don't believe that the statutes in either case gave any kind of right to the land itself. The assessments were not securitized in any way with the land. And I think in that case, the court struggled to really find a name for that kind of an interest. At one point they called it an estate. At one point they called it an easement. At one point they called it a covenant and a deed. At one point they called it a covenant running with the land. But the gist of it was that they did not find a lien, but decided that nonetheless, even though there was no explicit statement. How do you distinguish Mullins? Pardon me? How do you distinguish Mullins? I distinguish Mullins on the basis that the ordinance that the bondholders in that case were claiming compensation for was created a year and a half after the government already acquired the property. In that case, the court actually said that ordinance was a nullity, because the government had already owned the property at the time the ordinance came into existence. Our ordinance was created ten years prior to the condemnation in this case. The time of the ownership. Right, the time when the interest is created is very important. If it's created before the condemnation, then you have a secured interest before the property is condemned. If something is created after, it's subject to the government's ownership. The city argues that the TIF bonds, because of the phrase if any, are not protected property rights, but are mere unilateral expectations. Chicago argues the TIF bonds are worth nothing because the existence of any tax increment is speculative. Chicago is wrong. This argument does not change the fact that the bonds are irrevocable, contractual rights which are transferable, and they grant the holder of any bond the right to 100 percent of the tax increment from the redevelopment project until 2015, whatever that value may be. What's the meaning if any? It just goes to show that the interest is from the increment alone, and that Bensonville isn't required to pay the increment if it doesn't exist through their own municipal revenues. Why doesn't it refer to the taxes that are made reference to? If any taxes are collected. Right, it's just an emphasis. With or without the phrase if any, our interest is the same. Because obviously if you're given the right to tax increment, it must exist for us to be paid it. So it's our position that if any, whether it's in the instrument or not, we're the same thing. It's just an emphasis that our interest is in the tax increment. But what's critical in this case is that Chicago is arguing that we're speculative because we may not be worth something. And I think that that's attempting to prematurely value the bonds, and it's not an appropriate analysis to determine whether an interest is protected property because this court would be required to make a finding that the tax increment payable under the bonds makes them too speculative to value without the aid of expert testimony. Such a determination can only be made at the trial court level after experts have testified and are cross-examined, not to mention the record facts contain only one expert report, which is done on behalf of the bondholders that values the TIF bonds at $12.7 million. Chicago has no expert report. Was the change in the subject property's tax status both foreseeable risk and a purely collateral consequence of the lawful taking? No, it was not. To answer your first question about knowledge, knowledge of an impending condemnation project does not prohibit a purchaser of property from receiving just compensation. Assumption of risk does not apply in condemnation cases. If an individual knows a new road project is planned and they buy a house in the path of the new road, that new owner is still entitled to just compensation. The fact that they knew about the project before they bought it is meaningless. So your argument is premised on the fact that we have to look at much more than just the documentation of the bonds. I think we have to look in this case to all the bonds themselves as well as the covenants that make up the bonds, which are in the redevelopment agreement and the bond ordinance. And I think it's critical that we look at that intent just as the court did in Ajo and Fleuria. If you look at the instruments that create the property interest, and there's an intent that they always be paid, then that property interest is an encumbrance. It may not be a lien, but it's still an encumbrance. In Illinois, for example, when the government condemns property, they not only pay the fee owner, but they also pay for all encumbrances on the fee. Typically in condemnation cases, encumbrances that are usually paid are easements, leases, mortgages, liens. There's many different types of encumbrances. We are just a very unique interest that has not yet been analyzed by this court or any court in any jurisdiction. And the closest we have is Ajo and Fleuria in the sense that the statute itself did not give them a lien, but they read the intent of the statute to show that what the legislature wanted was for those assessments always to be paid, because otherwise the projects would fail. Tax increment financing is no different. In Ajo and Fleuria, the drainage district, they said if the assessments weren't paid for the project, the drainage district property would become valueless. Well, in Illinois, there's a finding that's required before a TIF district is set up, and that's but for the existence of the tax increment financing, this property would be valueless. It wouldn't be developable. It would be blighted property. So in essence, both types of districts will fail if compensation isn't paid in this case and these tax increment financing bonds aren't paid for. And if we look at the intent of our agreements, I think it's clear that all these different contingencies that the city throws out have been covered. For example, they argue that a charity or a church or a religious organization could buy the property. But unfortunately, that can't happen based on the agreements we have. The Bensonville's decided the exact use for the property. The redevelopment plan and the redevelopment agreement both set forth the exact type of development that's supposed to be built. They have site plans included in the documents. Aside from that, we have these covenants that state that Bensonville won't take any action that's adverse to the bondholders. Therefore, the Bensonville would breach those covenants if it rezoned the property, it gave a building permit, it issued an occupancy permit for any kind of charitable or religious use. That would then trigger a breach of the covenants and require Bensonville to pay the bondholders the value of the bonds. Also, Chicago says, well, Prologis, the owner of the property, they may not pay the taxes and then you won't get any increment. Well, that's not true either because the nature of our interest gives us statutory tax liens. So if for some reason the property taxes aren't paid, these tax liens operate for our benefit and we have first priority. We're ahead of first mortgages on the property. Not to mention, the county enforces a lien for us. The bondholders don't have to do anything. So to conclude on my first point, the bonds are protected property and the elaborate protection afforded to the bondholders demonstrate that the TIF bonds are protected property that should not be mischaracterized as unilateral expectations. Now, my second point, which I've already touched on, is the fact that the bonds encumber the real estate. Now, we've talked about AHO and FLORIA and I just wanted to bring up Omnia itself. In Omnia, that was a contract to purchase steel. Neither party had performed. It was a purely executory contract to purchase steel. In our case, we are dealing with real estate and an encumbrance on real estate. So for that same reason, the facts in Omnia aren't really helpful for our facts in this case. Additionally, Chicago tries to compare the bondholders to the school district in Lake County Forest Preserve District versus First National Bank of Waukegan to argue that this is a case involving consequential loss. In Lake County, the court held that a school district, like an individual taxpayer, did not have standing because the school district's interest in future real estate taxes was too remote to the real estate condemned. However, in AHO, the court also explains that cases involving general real estate taxes aren't controlling of the issue. The AHO court stated that general taxes are public burdens imposed to liquidate the general obligations of the state, county, or municipality. On the other hand, special assessments in the tax increment here are intended to pay for improvements that specifically benefit particular individuals and property in a designated area. The AHO court specifically stated that future general taxes to the various taxing districts to liquidate general obligations are not compensable, but the United States had to pay for just compensation for the future assessments in that case. Here, like the assessments in AHO, the tax increment is paid to the bondholders to pay for the improvements to the redevelopment area that was ultimately condemned by Chicago. The tax increment does not liquidate any general levies of any taxing districts. Furthermore, the Lake County court did not draw a distinction between tax increment and special assessments and general real estate taxes because that wasn't the issue in the case. Thus, Lake County, while correct on its merits, has no application to the instant case because it involved general taxes alone. Another difference between the bondholders and the school district in Lake County is that the lost tax revenue could be made up by the school district by reassessing other parcels in the school's district. In this case, Chicago has condemned the entire redevelopment area, so there's no other property available for us to receive increment from. Finally, in Lake County, the school district had no agreements in place that restricted the use of the property. The covenants in our bond agreement give us municipally controlled property that's always taxable. There isn't a situation that can bring us into a tax-exempt status. The only instances the city brings up are, well, charity or church. Well, we just said that can't happen because the principal violated his covenant, and they could go ahead and do that, but they're going to have to pay us damages under the contract for breach of that covenant, which would be the value of our bonds. The second instance the city says is, well, it could be condemned by a state, the state, the federal government, a railroad, Forest Preserve, the city of Chicago. But the problem with that is that's reading into either the assumption of risk argument that I already talked about, or it's essentially implying that if any language in our documents means that we're waiving just compensation in the event of a condemnation. And in Illinois, we have the case Department of Public Works and Buildings v. Exchange National Bank, which holds that an Illinois municipality cannot adopt an ordinance that requires an owner to give up compensation upon condemnation by either that municipality that issued that ordinance or any other municipality or any other government entity that condemns the property. So Chicago's argument is unconstitutional under Exchange Bank. My last point, and I'll make it very brief, is that the denial of just compensation in this case is inequitable and will undermine the future of tax increment financing by Illinois municipalities. The inequities in this case are clear. If Bentonville condemned the property, they would have reached the covenant they would have had to pay. If Chicago condemned the property in their district, they would have had like covenants because they would have needed them to ensure developers would come in and redevelop the property and to have marketable bonds. So in Chicago, they'd be paid. But in this case, Chicago's coming in and arguing that if it condemns in Bentonville, it doesn't have to pay. Well, that's just an unjust result. And they're just reading our covenants to give us absolutely no protection. Also, the United States Supreme Court has stated that the purpose of the takings clause is to bar the government from forcing some people alone to bear the public burdens which in all fairness and justice should be borne by the public as a whole. This is a prime example of that. The O'Hare Airport isn't benefiting just the bondholders, it's the public as a whole. So the bondholders shouldn't have to forego just compensation for their bonds. The public as a whole should pay just compensation for these bonds. And finally, if the TIF bonds aren't paid in this case, tax increment financing in Illinois will be harmed because the risk of condemnation with no compensation will make the number of parties willing to redevelop property in TIF districts that much less. Therefore, the very intent of the TIF Act to provide tax increment to foster private development in redevelopment areas would be undermined. Potential developers would try to seek additional security from the municipality in the form of general obligation bonds. So in conclusion, the bonds are protected property, the bonds encumber the real estate, and therefore the bondholders are entitled to just compensation in addition to the $94.5 million paid to the owner of the real estate condemned. Thank you. Thank you, Mr. Ryan. May it please the Court. My name is Mark Powell. I'm one of the attorneys representing the City of Chicago in this matter. The investors here contracted with Bensonville for a 10 percent annual tax exempt returns over the life of the bonds if and only if the TIF property generated and Bensonville received incremental taxes. The bonds were special limited obligations of Bensonville that made the bondholders' interest in payment of interest and repayment of principal itself entirely contingent. Moreover, the transaction gave the bondholders no interest in real property and no recourse against Bensonville if the property did not generate incremental taxes. This morning I will explain why the bondholders had no constitutionally protected property and why, even if they did, Chicago did not take it. On either ground, Chicago does not owe the bondholders compensation. In general, investors, as a matter of course, assume the risk that they will get lower than expected returns, no return at all, or even lose their entire investment. The TIF bonds offer the possibility of very generous returns, but such returns necessarily come with serious risks. The TIF bonds and the bond ordinance here made no secret of the risk that the bondholders would get nothing, and the bondholders, as acknowledged sophisticated investors, certified that they were aware of the inherent risks of their investment and could bear them. The bondholders gambled that their investment would yield a substantial taxes of return, but Chicago does not owe the bondholders compensation merely because that wager didn't pay off. The first ground on which the bondholders' claim falters is that they had no property interest in bond income. A constitutionally protected property interest is more than a unilateral expectation of a benefit. It is a legitimate claim of entitlement to it. It is something securely and durably held. The bondholders have no legitimate claim of entitlement to payment of interest or repayment of their principal. Instead, under the express terms of the bonds themselves and the bond ordinance, which is a contract between the bondholders and Bensonville, the bondholders have a right to payment only out of incremental taxes if any exist. The bondholders can't compel Bensonville to exercise its taxing power to pay the bonds. The bond ordinance could not be clearer on this score, defining the incremental taxes to be used for bond payments as the ad valorem taxes, if any, attributable to an increase in the current equalized assessed value over the pre-development equalized assessed value. The phrase, if any, which also appears in the bonds themselves, is standard language taken from the TIF Act. In addition, the bond ordinance, like the redevelopment agreement, makes the incremental taxes the sole security for payment on the bonds. Chicago's combination of the real property for which it paid imposed no additional uncertainty or risk on the bondholders beyond that already incorporated by the if any language and the sole security provision. The bondholders accepted the possibility when they purchased the bonds that principal and interest would not be paid. The bondholders, nevertheless, attempt to portray their gamble as a sure thing, but there could be no incremental taxes and thus no bond payments for many reasons beyond the bondholder's control. The economy could decline, the property could be destroyed, or the location could become less desirable, and there would be no incremental taxes. Those seem to me to be standard risks that would be assumed by the people buying the bonds. Are you arguing that eminent domain by another municipality is an expected standard risk that the bondholders should also assume? No, Your Honor. Our argument is that the multitude of risks that would be no payment on the bonds means that it is not a protected property interest. But if you're saying this eminent domain proceeding by another municipality has to be a risk that's assumed by bondholders, and obviously no bondholder is going to buy any TIF bonds if there's an expectation that the property is going to become exempt from taxation. The risks that you enumerated earlier were the typical, no increase in value, the different use of the property, no incremental taxes. Because it becomes tax-exempt. Is that a risk that the bondholders should foresee and are expected to absorb? That specific risk by itself, I would say, is not. It is one of many risks that they took in purchasing these bonds,  and, again, that could be for any reason having nothing to do with the city of Chicago. And, again, the relevant time to consider this is when the bonds were acquired, before the condemnation, because that's when the property interest, excuse me, the interest was created, the contract interest was created. And all of these risks were present at that time. The project could fail and there'd be no incremental taxes for any number of reasons. In addition, there are other factors that could determine the amount of property taxes. In addition to the market value, the level of assessment, the equalization factor, and the tax rate could fall or be kept legislatively, reducing or eliminating incremental taxes altogether. There are further risks in which there would be no incremental taxes, such as if the owner defaulted on property taxes because the tenants didn't pay rent. Condemnation by another condemnor, council mentioned that, state, federal government, railroad, or purchased by a private entity for tax-exempt use. Council referred to a situation where a charity would purchase a property and use it for tax-exempt use, but it's equally plausible that a private entity could acquire the property voluntarily and convert it to a tax-exempt use after the acquisition. And that possibility cannot be ruled out. Bondholders couldn't rule that out. Mr. Ryan would indicate that that was impermissible under the contract of the covenant with Vinsonville. Are you disputing that? To the extent that the conversion occurred after the acquisition, I am disputing that. You're saying that it could be converted to tax-exempt use by the municipality or by the owner by conveying it to a church or someone else, and there's no obligation then to pay the bonds, is that correct? There's no obligation from the purchaser to pay the bondholders. But does Vinsonville have an obligation? Vinsonville may under the terms of the contract. As a matter of contract, that is conceivable. But there's no other basis on which the private purchaser would owe the bondholders compensation. In addition, the bondholders have attempted to characterize the bonds as an encumbrance on the redevelopment property. But the bonds conferred no protected interests whatsoever in real property. Again, pursuant to the TIF Act, the sole source of payment was any incremental taxes that existed. The bondholders rely on Vinsonville's ordinances to show an encumbrance, but none of them gives the bondholders that or any other protected interest in the redevelopment property. Recognizing that bond income would not be exempt from federal taxes if the bonds were secured by anything other than incremental taxes, the bondholders did not obtain an interest in the property such as a mortgage. Rather, as the bond ordinance made clear, the bondholders had only a right to incremental taxes if any existed. The bond ordinance and the redevelopment agreement made any incremental taxes in the allocation fund the sole security for the bond. As for the redevelopment plan, which Vinsonville did adopt by ordinance, it simply recognizes that Vinsonville may issue obligations secured by incremental taxes. In any event, Chicago is a party to none of these agreements and is bound by none. The bondholders compare their interest to a mortgage. That's true. So how do you address the equity argument raised by Mr. Ryan, with respect to since it's Chicago that condemns, they end up with nothing here? Well, there's no inequity because Chicago had no contract with these bondholders and its acquisition of the real property was fully authorized by the O'Hare Modernization Act as well as the only municipal code before it. If there's some inequity in the situation, it could have been addressed legislatively during the consideration of the statutes authorizing Chicago to acquire property in another municipality for airport purposes. And, again, that authority existed. It certainly was specifically confirmed in the O'Hare Modernization Act, which came after the purchase of the bonds here, but the only municipal code has for decades, long before the bonds here were purchased, authorized Chicago to condemn property adjacent to O'Hare in a neighbor municipality for airport purposes. Does this chill redevelopment? Excuse me? Does this chill redevelopment prospects? I don't believe it does, Your Honor. There are a number of mechanisms through which a municipality under the TIF Act can secure the bonds. They can even pledge their full faith in credit. They can pledge taxes from sources other than the redevelopment property itself. And there was a choice here, I think, by Bensonville to structure this obligation in a special limited fashion, which is permitted by the TIF Act, to be sure. But the rights, if any, of the bondholders to payment spring from the contract, and that only runs with Bensonville. That, their remedy, if any, is against the municipality. And those contracts can be negotiated. It's really a matter for the bondholders to negotiate. I don't think that requiring that negotiation will chill the bond market for TIF bonds. Also, the principles that require rejection of the bondholders' claim against Chicago are not novel. They're well known to sophisticated investors. And so this kind of thing should have been taken into account to begin with in terms of sizing the bond and the kind of payout that they would get if the conditions were met. The bondholders compare their interest to a mortgage, but the TIF bonds are in no way secured by property. If they had been, the bond payments would not have been tax-exempt. Even if they were, in effect, a mortgage, that would not give the bondholders a right to compensation from Chicago, in addition to what Chicago paid Prologis, the fee simple owner, for the real property. A mortgage does not increase the award of compensation for a condemned property because it does not increase the value of the property. Therefore, a mortgage would give the bondholders a claim against Prologis for a portion of the award, not a claim against the city for compensation beyond the $94.5 million the city paid for the real property. The bondholders rely heavily on AHO and FLORIA, cases from another jurisdiction that are neither precedential nor persuasive. In any event, the bondholders are nothing like the drainage districts in AHO and FLORIA. The districts there levied assessments to cover the costs of drainage works that benefited all land within the drainage districts. Here, the payments were made from taxes, which the property owner would have had to pay, even if there had been no bonds. The allocation of incremental taxes to a special fund from bond payments does not make such taxes assessments. Moreover, the encumbrances in AHO and FLORIA represented the right of all landowners in the drainage district to a constant level of assessment to protect them from higher levies and to ensure that the project remained financially feasible, which it's clear from those cases is a serious concern. Here, Chicago's condemnation disturbed no predetermined allocation of payments among property owners. There are no property owners left to affect in the redevelopment area, and no owner was obligated to repay the bonds in the first place. A second independent ground on which the bondholders' claim fails is that Chicago did not take or damage the bondholders' interest in bond income or the bonds themselves. At most, Chicago's condemnation of the real estate frustrated the contract between the bondholders and Bensonville. There is no right to compensation for this kind of downstream, indirect consequence of lawful condemnation. Omnia and Mullen, which applied this rule to claims under the Federal Takings Clause, are controlling here. How do you distinguish AHO and FLORIA? Well, Your Honor, those cases involved assessments on the land, and the property there didn't matter if the property was taxable. The assessments would have still been owed under Oregon law. In this case, we have obligations funded by general taxes, which don't become something else, assessments, for example, by being allocated to a special fund. In other words, there was an encumbrance, again, that's under the Oregon statutes in those cases, that simply did not exist here. The bonds are no more an encumbrance on the property here than a school district is on property within its district. Both depend on taxes for payments, but it doesn't make them an encumbrance on the property which is expected to generate the taxes. Mr. Powell, a few minutes ago you mentioned that if this were a mortgage, there wouldn't be a separate right for the mortgage holder to be compensated. It would have to come out of the proceeds. At first blush, it seems inequitable to say that money from these TIF bonds would go into the project, improve the project, and then the developer gets the benefit of that. Are you arguing, and I think maybe you did, argue that this action should be by the bondholders against prologus because the value emanating from the bonds that were purchased and used in this project were included, or the value that I guess the incremental value of the property was increased by virtue of the bonds, and therefore the action should be against the bondholder, against prologus. Excuse me. Your Honor, without going too far down that road, I think that if there is a claim, if they have a claim against anyone, it is against prologus because you're correct. The proceeds of the bonds were invested in the property to pay for certain TIF eligible costs, acquisition of the property, environmental reviews, site assessments, and those prologus accepted compensation, agreed final judgment order, that covered all of the value of the improvements as well as the dirt, the property itself. So doing it has, in essence, some of the benefit of the use of the proceeds from the bonds that were invested in the property. The bondholders speculate that the plaintiff company in Omnia could have procured steel plates from another source, so the company didn't suffer a total loss, whereas these bondholders could look to only one source, the incremental taxes, and in the city's hands, the property will allegedly not generate such taxes. That's really beside the point. The only question is whether the bondholder's loss constitutes a taking. The extent of the loss is not relevant to that question. They also haven't distinguished Mullen. It's immaterial that the reassessment there came after the government acquired the property, whereas the bonds here were issued before condemnation. That timing was significant in Mullen because only assessments that preceded the government's acquisition could become liens on the property, and the municipality claimed that by precluding the possibility of imposing liens for reassessments, the federal government had impliably promised to pay the reassessments. That is not a takings claim, which is all our case involves. In any event, here the bonds were not a lien or encumbrance on the real estate for reasons having nothing to do with when they were issued. Additionally, we also argued there was no damaging here. There was no physical disturbance of the bonds or any right to any connection with them. Again, this is a nonphysical consequential injury resulting from lawful condemnation of property. And finally, neither equity nor sound policy favors the bondholders. Despite the repeated references to extraterritorial condemnation, there is nothing suspect or even unprecedented about Chicago acquiring property adjacent to O'Hare for airport purposes. Condemnation of the redevelopment property for O'Hare expansion was fully authorized by the O'Hare Modernization Act, as well as the Illinois Municipal Code, which has long authorized Chicago to establish and maintain airports on property outside the corporate limits and to condemn property for airport purposes. Nor does it help the bondholders that, as they claim, they fully perform their contractual obligations. They funded nothing of value to Chicago, which intends to use this for airport purposes, and have not been asked to do so. Indeed, Bensonville, the only party with which they did contract, and the intended beneficiary of the redevelopment, doesn't even owe them compensation because the contract recognizes the bondholders would get nothing if there were no incremental taxes. Chicago's condemnation simply triggered the risk that was out there all along, that there would be no incremental taxes and nothing to pay the bondholders with. If there are no further questions for these reasons and the reasons given in our brief, we ask that this Court affirm the appellate court's judgment. Thank you. Thank you, Counsel. Good morning. My name is William Ryan, and Chief Justice and Your Honors, if it may please the Court, I'd like to address a number of the points that were raised by the City of Chicago. Mr. Ryan, can we start with something I believe was raised by Mr. Powell, that the right of action is either against Bensonville, although I thought that was somewhat disputed in the last statement, where they say there's no remedy against Bensonville, or in answer to Justice Carmier's question, against Pro Logis. Is there a right of action there? Has that been contemplated, or why are we in the proper forum here in an action against Chicago? To answer your question directly, we have no cause of action against the village of Bensonville. Bensonville has performed under our agreement. They gave us all the tax increment that was generated before the city condemned. We have no action against Bensonville. We also have no action against Pro Logis, the intervening bond owners. And the reason is this. The City of Chicago and we agreed in the judgment order that the bonds owned by the intervening bond owners are not part of the 94.5 million. That's a specific agreement in the judgment order. Now, the bonds that Pro Logis owns and the bonds that the interveners own, there's a total of 12 bonds. Pro Logis is 2.8. The remaining bonds are 4.2 million. They're identical bonds. There's no difference in one single word between those bonds. So when the city agreed that the 4.2 million owned by the 11 interveners is not in the 94.5 million, it's also clear that Pro Logis' bond isn't in the 94.5 million. That's for the real estate. And the appraisers, we had our own appraiser, they had their appraiser, which we cite in our brief. They appraised the property subject to the right or the obligation to pay future taxes, like every appraiser does. But in our instance, we have a plus, because for 10 years after the condemnation, from 06 to 16, we get the tax increment back. Neither appraiser considered that. It's not in their appraisal. They didn't value it. And that's why it's not in the 94.5 million. Like Ajo and Fleuria, we're asking for compensation for our bonds that is in addition to the land value subject to taxes. So in Ajo and Fleuria, the court said we're going to have to determine or the trial court's going to have to determine the value of this interest of the future assessments, and that will be added to the land. So it's crystal clear. We don't have a cause, the interveners don't have a cause of action against Pro Logis because it's not in the 94.5 million. The city agreed. The second thing I'd like to address is we haven't talked this morning about the facts. And the city keeps arguing, look, there isn't going to be any increment. You don't have any right to anything. Who knows if there's going to be anything there. Well, that ignores the facts. This district was created in 1996. By 2006, when they condemned the property, we had built five buildings that total 613,000 square feet, which accommodates over 10 football fields of new industrial buildings right at the cargo entrance to O'Hare Airport. We also had achieved, as of 2006, $2.3 million in increment that had been paid to us. So there's no question about if are we ever going to get increment. We were getting increment. We were getting about $700,000 a year per our report that's in the record. And when the city came along and condemned it, that stopped our ability to get increment because now the property went tax increment. I mean, went tax exempt. So there isn't an issue here about how we get. Is there a question then, Mr. Ryan, as to how damages would be assessed? Well, the damages in this case, Your Honor, would be assessed in this fashion. We'd have to go back to the trial court and value our bonds. We have a report in the record that values our bonds at $12 million. I'm sure the city would dispute that. But it's a valuation issue to look at what's there in 2006, six buildings. How much increment are they generating? In the past, it was about $700,000 a year for three-plus years. And what's the next 10 years going to be? And there's another fact that's key that we haven't mentioned today, and that's this. And it's in our reply brief. The frozen base was $3.9 million of assessed value. That's when they created the district. After we built, we were far in excess of that. Hence, we're getting the tax increment. And half of the property, really 60% of the buildings, are in Cook County. We had a 6B tax assessment that was issued there. So on the 06 date, our assessed value was 16% of market value. It was going to go up to 23%, 30%, then 36% in the future. So we were guaranteed that as time went on, our assessed value was going to go up on these same buildings, and we were going to get more tax increment. But all of that really goes to value, which we're suggesting should be done at the trial court level, where there's expert testimony, and both sides are allowed to put on all the relevant evidence. But it's important to understand that in this case, I mean, this isn't make-believe. And I disagree with counsel. I don't think 1996 is when we look at this interest. I think we look at it in 2006 when the city filed a petition to condemn. That's when you determine what interests are taken. That's when you determine what the property is valued at. Now, in our view, there's a number of other issues, and let me address some of those. The city wants to take the position that eminent domain is a risk that we took. I think there was a question about that. And now they seem to be saying, well, that may not have been a risk. Well, clearly it wasn't a risk. We're not responsible for assuming there's going to be a future condemnation, and then because of our if-any language, losing the right to just compensation. Fifth was in existence for many years before, and the right of the city of Chicago to condemn property was also in existence long before this deal began to develop. The bondholders here warranted that they independently investigated the circumstances surrounding the issues of the bond and security and sources of the payments. In addition, the bondholders characterized themselves as sophisticated investors, able to handle, analyze, and evaluate risk, economic and otherwise associated with investment of these bonds. How does risk, how does that affect risk in your argument? In my opinion, risk is not an issue, and the reason is this. Department of Public Works versus Exchange Bank, in that case that my firm handled, the owner of that property went to the village of Addison and they said, we'll rezone your property to business, but when Route 53 comes through your property, will you agree, Mr. Owner, that the property will Were these investors aware of TIF and the city of Chicago's ability? Well, no, they couldn't have been. In 2002, the city passed the ordinance. In 1996, we entered into our redevelopment agreement, so there was no knowledge on the part of our owners that they were going to expand O'Hara into Bensonville and take public land and go through quick take, and I think the briefs admit that the first public hearing was in 02, six years after our redevelopment agreement was signed, so they didn't know. Airports expand all over the country. They do, absolutely. This is sitting right next to an airport. Let me just ask you about the chilling effect that was also brought up. What concern should a chilling effect on TIF investments have on a judicial opinion? Well, I think the chilling effect that we're talking about is the validity of the whole TIF program. There's 1,000 TIF districts in Illinois, 140 in the city of Chicago, and it's a tool that's used throughout municipalities. If people that purchase TIF bonds understand from a case or a decision like this that if you own the TIF bonds and they're not secured by the real estate, they're secured only by a contract with the municipality for tax increment, and you're not going to be compensated when those TIF bonds are condemned or taken or destroyed, we think that will affect what purchasers will pay for TIF bonds and affect the whole. How should that affect the judiciary in resolving the legal issues? To pick the fact that they would be a chilling effect. Well, I think that the Ajo and Fleuria courts look to the effect that the condemnation would have on the drainage districts, and I think similarly it's fair for this court to look at the effect this kind of a decision would have on tax increment districts so that when they analyze in Ajo and Fleuria that the whole intent of that drainage district was for people to be paying these assessments in the future, well, the same is true here. The intent is, pursuant to our entire agreement, that this property would be taxable in the future and that people would pay the tax increment and you'd get paid on your bonds. But the one other point I'd like to make, because I really want to make sure that at least I'm addressing it correctly, I don't think risk of condemnation is a valid point for the city to argue. If I buy a piece of property the day before it's condemned, they must pay me, and I don't think if any mean I waived my right to just compensation. I know your light's on, but if it's okay with the Chief Justice, which you just said it was. We've bannered it about a number of times. There have been a number of questions. I'd just be interested in your take on Mullen, though. Well, my take on Mullen is that the United States Supreme Court said the ordinance in Mullen that was enacted a year and a half after they owned the property to create new assessments was a nullity. The Ajo court used that analysis in distinguishing Ajo. I respectfully think we should do the same in this case. Our bond was enacted ten years before the city of Chicago came on the scene, not a year and a half after they owned the property. If there's no other questions, thank you. Thank you, Mr. Wright. Thank you all, counsel. Case number 106805, we take it under advisement.